UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
— — — — — — — — — — — — — — — — — —-X

CATELIN CLOBES,                                    Case No.: 21-CV-2117 (PJS/JFD)

                    Plaintiff,

Against                                            PLAINTIFF'S SECOND AMENDED
                                                  COMPLAINT WITH JURY DEMAND

NBCUNIVERSAL MEDIA, LLC.
BRANDY ZADROZNY,
ALIZA NADI,

                    Defendants.
— — — — — — — — — — — — — — — — — —-X

       NOW COMES Catelin Clobes ("Plaintiff"), by and through counsel, and states her

Amended Complaint for Defamation against NBC UNIVERSAL MEDIA, LLC., BRANDY

ZADROZNY and ALIZA NADI ("Defendants") as follows:

       Plaintiff seeks (a) compensatory damages and punitive damages in a total sum to be de-

termined by the Jury, (b) prejudgment interest on the principal sum awarded by the Jury from

September 24, 2019 to the date of Judgment, and (c) court costs – arising out of the Defendants'

defamation.


## I. INTRODUCTION


       1.      Prior to her daughter's death on March 1, 2019, Plaintiff was a single mother liv-

ing a non-public life in a small town in Minnesota unknown to anyone other than her family,

friends and some people in the local community.  During the period from the death of her baby,

Evee, to the publication of the article on September 24, 2019, Plaintiff had some profile on social

media and her focus was on trying to determine the cause of her daughter's death.  Most of those

who interacted with her were from the "health freedom" community.  She had no media exposure

but put up one billboard in Minnesota which did not contain her name.  The NBC article cata-

pulted her into national prominence – and disparagement – in the news media and throughout the

internet on social media.

2.      On September 24, 2019, Defendants published an article about Plaintiff that has

forever changed Plaintiff's life.  https://www.nbcnews.com/tech/social-media/how-anti-vaxxers-

target-grieving-moms-turn-them-crusaders-n1057566

The NBC article appeared online September 24th, 2019 and Brandy Zadrozny did the in-

terview on their website and social media the same day.

https://www.youtube.com/watch?v=0l1PQ6IUUaU

3.       The article contains innumerable errors of fact, false statements and misrepresen-

tations that have resulted in reputation harm and damage to Plaintiff, reflecting on her personal

character, her fitness as a mother, her ethics and moral turpitude as well as allegations of criminal

behavior. This has caused her severe physical, mental and emotional distress and impacted her

health and wellness.

4.      The article, in journalistic terms, was a "news story" and not an "opinion piece"

such as a column, editorial, bylined article by a non-journalist addressing a particular subject or

matter, etc. Therefore, by journalistic standards and ethics, a news story is required to be fair and

balanced and not biased or slanted to a particular point of view through such means as inflamma-

tory or misleading language or omission of vital information. The purpose of this is so a "reason-

able person" that read such an article would conclude that all the facts, information and state-

ments in the article were accurate and did not support a particular view. (See Declaration of Robert J. Fisher, ¶ 9).

5.     In journalism, for a reporter to insert his or her view in a news story is referred to as "editorializing." The definition of editorializing is: "*Inserting one's own opinions into news coverages. This should not be done because it is a journalist's job to present the facts and let the audience form their own opinions. If editorializing occurs, it risks alienating the reader who may view the work as biased to one point of view.*"  (See Declaration of Robert J. Fisher, ¶ 9).

6.     Based on my educational and professional background in journalism, it is my opinion that the reporters who wrote this article clearly editorialized through the use the words they used, the information they provided or failed to provide, the inferences that were made and the liberties they took in piecing together information that would lead a "reasonable person" to form conclusions that were not accurate. This, along with the errors in facts, false statements, misrepresentations, have combined to cause short and long term reputation harm and other forms of physical and emotional damage to Plaintiff.  (See Declaration of Robert J. Fisher, ¶ 10).

7.     According to Plaintiff, the article is replete with errors of fact. For a major national and generally respected news outlet, I find this at once surprising and distressing. It is representative of the poor quality of writing and would naturally lead one to question if this carelessness carries over to the accuracy of other information in the article. Following are examples of the innumerable errors of fact that permeate the article:

● Stated that the baby received several vaccinations. (The baby had six vaccinations)

● Stated that the detective examined the baby at her home. (It was at the hospital.)

● Stated that tissue samples were retained by Wright County. (It was Anoka County.)

3

• Stated that within hours after posting her feelings on Facebook (early March), she received answers. (She didn't get conclusive medical answers until August of 2020.)

• Stated that Health Choice Minnesota paid for two baby billboards outside of Minnesota. (At the time the article was published, there was only one billboard in Minnesota, which she paid for.)

• Stated that she was open to anti-vaccine messages aimed at her. (Prior to the article she was only focused on determining cause of death. She was "open" to "vaccines causing sudden infant death syndrome & the truth about them, not "anti-vaccine" messages).

• Stated that Plaintiff said on social media that Dr. Miller would be doing her study. (She was actually trying to keep his role private. Zadrozny subsequently admitted that the source for this information in fact came from a Dr. Ron Kennedy, not social media,)

• Stated "Areas of the nose, chest, arms and legs were discolored and pooled with blood, indicating Evee had been face-down for some time." Errors in that sentence, include:

■ There was no reference to legs in the investigative report.

■ Both arms did not have pooling of blood, only the right arm.

■ While the chest did have pooling of blood, the cause was lividity, not being face-down.

■ The area of the nose had white pressure markings not pooling of blood. (Clobes contends that the reporters took this information from the "falsified" letter written to her by medical examiner for which she is now under investigation by the medical board.)

• Stated there was a "*separate Evee-branded campaign*." (There was no campaign before article.)

4

● Stated her Facebook page draws hundreds of views. (Can't be determined).

8.      Clobes identified at least 15 false statements contained in the article. Many of these fueled the vitriolic negative communications directed at her and resulted in the reputation harm and damage she has experienced. Following is a representative list including nine of them:

● "*Clobes ….now say that vaccines caused Evee's death*." (She never made that assertion at the time the article was published because she hadn't yet received test results from the medical professionals.)

● "*Evee had been face down for some time.*" (There was no medical or investigative report that made that conclusion and Clobes reports she had expert reports stating the exact opposite.)

● "*Three months later, at Clobes' request, the same examiner reviewed the case and amended the cause of death to positional asphyxia or suffocation.*" (She never asked the examiner to review the case because she disputed her original findings and was seeking an independent test/study. Also, in no official report of any kind has the word "suffocation" ever been used.)

● "*Clobes hinted she might sue the Wright County Medical Examiner over a "cover up."* (She never planned to do so or ever expressed that she was considering it. Also the medical examiner was with the Midwest Medical Examiner's Office in Anoka County, not Wright.)

● "*Clobes has received more than $22,000 and has raised to goal to $40,000.*" (She never had a "goal" of any kind and had never expressed having one. She also didn't even start or run the fundraiser mentioned in the article or "raise the amount".)

● "Her face and chunky legs – adorned with Band-Aids from her shots – are featured on anti-vaccination ….billboards." (There was only one billboard - not multiple - at the time the article was published and there was no mention of "vaccinations" anywhere on the billboard.)

● "In August, she registered the Justice for Evee Organization as a nonprofit in Minnesota and began soliciting donations." Three false statements in this one sentence:

● She has never registered an organization of any kind.

▪ The organization is not a nonprofit organization (or business) in Minnesota or anywhere.

▪ She didn't personally solicit donations, others did.

● "(donations)…with proceeds slated to go to anti-vaccine advocacy in Minnesota and beyond." (She did not even begin to receive donations through the website until the year after the article was published, 2020, and those donations were never for "Minnesota and beyond." All money received from donations prior to the article being published was for pathology and legal fees related to determining the cause of the baby's death.)

● "*Clobes rejected these findings in an interview with NBC News.*" (She never "rejected the findings" because the pathology study was still in progress at the time and no conclusions had been reached at that time. She never did an "interview" with NBC News."

9.     These false statements (along with the others not included) caused Plaintiff reputation damage as reflected in hundreds of social media posts by people who interpreted them to mean that she:

● Was delusional about how her daughter died and most likely was clearly responsible for her death.

● Sought to profit from her baby's death through various forms of fundraising.

6

● Sought to garner public attention to herself by being a crusader for the anti-vaccination movement.

10.     "It is my opinion that after complete examination of the investigative and detective re-enactment photos, autopsy findings and special studies this case is most likely Sudden Infant Death Syndrome (SIDS)." (Declaration of Steven Rostad M.D., ¶ 7).

11.     "Although there are sleep environment risk factors for SIDS, there is no evidence for a death due to positional asphyxia. Likewise, finding in support of other sleep-related suffocation deaths attributable to overlay or wedging are absent. There is no evidence for airway obstruction or chest wall compression. There is no marked congestion, hemorrhage or petechiae. The term "positional asphyxia" is unjustified as a cause of death in Evee's case. There is no evidence of trauma, abuse or neglect. (Declaration of Steven Rostad M.D., ¶ 8).

12.     The International Congress on Unexplained Deaths in Infants and Children further clarifies the use of the term "asphyxia," with the following:

*"The presence of sleep environment risk factors without adequate evidence for airway obstruction or chest compression were considered insufficient to certify a death due to asphyxia. The need for stringent criteria before using "undetermined" or asphyxia, categories that shift away from SIDS, was emphasized, along with the need for precise, descriptive terminology. There was affirmation that once abuse, neglect and trauma are eliminated, the needs of the family should be prioritized by clearly explaining the strength of the evidence for why the infant died and potential implications to them."*

(Declaration of Steven Rostad M.D., ¶ 10).

13.     As intended, Defendants' false and defamatory Statements were republished millions of times on the Internet and via social media. The Statements were immediately understood by viewers to convey a defamatory meaning

14.     In terms of reputation damage, the great harm to Plaintiff came through the reporters' highly inappropriate and damaging "editorializing" which is rampant throughout the article – depictions of Plaintiff and her daughter that are their own speculation and have no basis in fact and constitute gross misrepresentations. The article made numerous assumptions and assertions which were clearly opinion and journalistically unethical which were interjected in the news story. They include:

- *"…Evee has served as a literal poster child for the **anti**-vaccination movement…"*
- *"…turned a grieving mom into a rising star in the anti-vaxx world."*
- *"…she has become a champion of other anti-vaccination parents around the country."*
- *"…Clobes' new role as an anti-vaccine heroine."*

(See Declaration of Robert J. Fisher, ¶ 13).

15.     These assertions and suppositions were not attributed to any source and, in reality, were the opinions and conclusion of the reporters who wrote the article. It clearly gave the impression that Plaintiff was:

- *Exploiting the death of her child to benefit her and the anti-vaccination movement.*
- *Proactively seeking to become the focal point representing other parents who lost children.*

8

- *Seeking to become famous through her child's death (e.g. "rising star," "heroine," "champion").*

(See Declaration of Robert J. Fisher, ¶ 13).

16.     To cite one example that is a direct contradiction to the assertion that Plaintiff proactively sought to be a leader, champion or outspoken advocate of the anti-vaccination movement, prior to the publication of the NBC article, Defendant Zadrozny asked Plaintiff to do a television interview to tell her story.

Defendant Zadrozny: "I want to talk to you about a televised interview. It would give you a chance to tell your story to literally millions of people."

Clobes responded in writing:

"Why me? I'm nobody special, just a grieving mom. Don't want to be put in that kind of spotlight. There is nothing prominent about me."

(See Declaration of Robert J. Fisher, ¶ 13).

17.     This aforementioned exchange came within days of the article's publication. One has to seriously question why a person that was allegedly out to seek fame and/or to be a crusader or leading advocate for a cause would turn down a television interview that would be seen by millions of people. In fact, her words emphatically emphasized that she didn't want the attention.

18.     The NBC article breached a wide range of journalistic standards and ethics. As advanced by the Society of Professional Journalists, the nation's oldest and most respected trade organization in journalism, here are a few examples of those which this article breached:

- "Journalism ethics include the principle of "limitation of harm".

- "Journalists cannot always guarantee 'truth', but getting the facts right is the cardinal principle of journalism."

"Most stories have at least two sides. Stories should be balanced and add context."

- "Balanced means exploring all sides of an issue and reporting the findings accurately."

Particularly, with respect to **this article**, the following two are particularly pertinent:

- "Fairness means that a journalist should strive for accuracy and truth in reporting, and not slant a story so a reader draws the reporter's desired conclusion."

- "The principle of "limitation of harm" which questions whether everything learned should be reported and, if so, how. Also, some weight needs to be given to the negative consequences of full disclosure."  (See Declaration of Robert J. Fisher, ¶ 14).

19.     "As a former professional journalist, when I see a news story such as this, which is so one-sided, slanted and biased, the operative question is why. As I don't believe NBC itself as an entity is biased, I researched the reporters, specifically Defendant Zadrozny, who was the only of the two reporters who was in contact with Clobes. What is clear is that Defendant Zadrozny is not a neutral, unbiased reporter. She is an activist for vaccinations and against the anti-vaccination movement."

(See Declaration of Robert J. Fisher, ¶ 15).

20.     There are innumerable social media posts by Defendant Zadrozny that demonstrate her support for vaccinations and her opposition to those opposing them. One such post illustrates how the NBC article was influenced/slanted by Defendant's advocacy and beliefs:

10

*"Mothers are testifying about their babies who they think were hurt by vaccines. The anti-vaccine community leaps onto these stories and uses them as a way to push information. It's all so terribly sad."*

This long held (and advocated) view by Defendant Zadrozny led to and unquestionably "colored" the content and slant of the article. It is my expert opinion that the reputation harm that Plaintiff has and will suffer from this article can be traced to Defendant Zadrozny's bias and her crafting of the article to generate exposure to reflect her own point of view. This is evidenced by the following actions and inactions:

Defendant Zadrozny used the "wolf in sheep's clothing" approach to deceive Plaintiff (ethical questions here) and there never was an interview (defined as a "structured conversation with formal questions and answers") with Plaintiff (as the article claimed) because Plaintiff was only providing background in bits and pieces – with no knowledge she would be the primary subject of it.

(See Declaration of Robert J. Fisher, ¶ 15).

21.     Articles can be slanted by what you put into the article which isn't relevant and what you leave out of an article which is relevant. Two (of many examples) of this in the article:

By far, possibly t***he most damaging inclusion of information*** that was not necessary was "*Clobes had a whiskey cocktail.*" "It was a small reference included in the detective's report that was not germane or had any relevance to the baby's death. Still a seasoned journalist would know that mentioning the mother had a drink the night the baby died – and how she died (in bed) would be highly prejudicial and give a false impression. Any journalist knows this would lead many people to incorrectly assume or

11

extrapolate that she was drunk and therefore was a factor in or the cause of the baby's

death. Defendant Zadrozny knew that. Journalists more than anyone know words have

consequences.

(See Declaration of Robert J. Fisher, ¶ 15)

22.     Following are a couple of the hundreds of examples of what that aforementioned

unnecessary piece of information did to Plaintiff's reputation:

> --- "*This heffa knows her drunk ass rolled on that baby. If she was sober she would've known She was on her baby.*"
> --- "*Drunk bitch is the reason her baby died. You're anti-vaxxer but drinking alcohol…*
> --- "*Is this to bad-mouth the cunt that suffocated her daughter with unsafe sleeping habits while drunk?*
> --- "*You got drunk and smothered your child. You should be in prison.* "
> --- "*Getting drunk, cosleeping, and suffocating your child also causes death.*"

23.     Additionally, Defendant Zadrozny reported the following remark that was made

during Plaintiff's  9-1-1 telephone call reporting the baby was in distress: "*This is because she*

*was sleeping with me.*" The publication of this comment made by a hysterical mother in shock

after seeing her baby possibly dead combined with where the baby died (in bed) naturally would

lead people to wrongly speculate that she "smothered" her baby (which the reporters knew wasn't

true when the article was published six months after the baby's death). Again, this led to these

following vitriolic comments that caused severe reputation harm:

> --- "She rolled onto her kid and the kid died."

> --- "The fact that Catie Clobes, who suffocated her daughter Evee

> --- "You smothered your fucking baby. Accept it.

> --- "YOU SUFFOCATED YOUR INFANT DAUGHTER AND ARE TOO MUCH OF A

FUCKING COWARD TO TAKE RESPONSIBILITY!"

--- "Getting drunk, co-sleeping, and suffocating your child also causes death."

(See Declaration of Robert J. Fisher, ¶ 15)

24.      Both of these were inflammatory pieces of unnecessary information that were not needed to tell the story. Any journalist would know **this** would result in significant reputation harm. ("The principle of "limitation of harm" which questions whether everything learned should be reported and, if so, how. Also, some weight needs to be given to the negative consequences of full disclosure.")

(See Declaration of Robert J. Fisher, ¶ 15)

25.      There was a significant amount of information not included in the article which would have been beneficial to Plaintiff. As an example, the Wright County Sheriff's Office issued a report at the conclusion of its investigation into the death of the baby which was not shown in the article. Numerous parts of the report were redacted and those portions were favorable to Plaintiff. ***The most important was the last section of the report which stated that it concluded that the position that Plaintiff said the baby was in was consistent with what the evidence showed.*** This is a vital fact that might have deterred many of the vitriolic comments about her role in the baby's death. (See Declaration of Robert J. Fisher, ¶ 15)

26.      Once again, these aforementioned two examples of "slanting" a story through information provided violates the journalist standard: "Fairness means that a journalist should strive for accuracy and truth in reporting, and not slant a story so a reader draws the reporter's desired conclusion."

27.     Defendant Zadrozny is no stranger to "crossing the line" between advocacy and objective journalism in other areas as well. Trump supporters have claimed *"Zadrozny has a long history of targeting Trump supporters for doxing, censorship, and harassment. She poses as a neutral reporter, but like so many other "journalists" in 2020, she is simply an ideologically-motivated hitman."* If the subject defamatory NBC article had been positioned as an editorial or column or a one-person by-lined perspective piece, it would have been perfectly acceptable. However, any "reasonable person" who read it would have felt the information and conclusions in it were fact.

28.     With the publication of the article, it started a firestorm of negativity towards Plaintiff that catapulted Plaintiff into being a disparaged figure as reflected in a raft of other articles (both online and offline) negative to Plaintiff as well as a massive increase of negative internet exposure (e.g. social media posts, blogs).

29.     A review of 25 articles written and not one was published before the NBC article. Further 90 percent of them were published within days of that article, indicative that that article spawned the others. Therefore it is reasonable to conclude that the vast majority of all forms of harm and damage Plaintiff is experiencing emanate from that article.

30.     Plaintiff has experience severe <u>Reputation Damage.</u>  Hundreds of social media posts (plus blogs) that were published after the NBC article appeared (which can be traced directly or indirectly to the article) and Plaintiff has been consistently labeled, accused and portrayed as:

▪ <u>A</u> criminal, murderer, "baby killer," etc. who should be in jail.

14

- <u>A</u> liar who is trying to deflect blame for her own wrongdoing by fabricating stories.

- <u>A</u> scam or con artist who is bilking people for money.

- <u>A</u> person seeking fame and money off the death of her child.

- <u>A</u> mother who killed (smothered) her child through negligence and carelessness.

- <u>A</u> "crusader" who is misleading grieving mothers and using them for her own aims.

- <u>A</u> drug addict.

- <u>A</u> drunk and alcoholic.

- <u>A</u> psychopath.

- <u>A</u> danger to society.

31.   Plaintiff has suffered severe physical harm and has reported that the mental problems directly resulted in the following negative physical effects to her:

- <u>O</u>ngoing stomach problems and disorders which led to the removal of her gallbladder.

- <u>O</u>ngoing chest pains and ventricular hypertrophy which requires visits to a cardiovascular specialist.

- <u>A</u> miscarriage.

- <u>O</u>ne attempt at suicide (which almost was successful as when found, she had no pulse and was not breathing and was rushed to the hospital.)

15

■ A permanent "tic" in her head she can't control.

■ No sex drive and the absence of her menstrual period for the last year.

■ Physical pain that requires regular visits to a chiropractor.

■ An ongoing lack of energy which makes her not want to get out of bed nor shower, take walks, grocery shop or do normal errands.

32.    Life Disruption – Plaintiff reports that the NBC article has been used in many ways by others to cause her harm and damage in her personal life. These harms include:

■ From the instant the article was published and for the 19 months since, she has been bombarded with vitriolic comments on social media posts, by telephone and in the mail.

■ As a result of an NBC reporter intimidatingly probing for information from a neuropathologist who she had worked with for many months to do a study of her dead child's tissues, the doctor withdrew from the study causing a significant time delay and cost to replace the doctor for the testing.

■ Her son's father used the article in a mediation to obtain custody of the child and later used the article's reference to fundraising to seek increased child support.

■ The article was used to successfully have two billboard contracts she had cancelled in California, Minnesota and Iowa.

■ The article was used and distributed by doctors and politicians for various purposes that were detrimental to her.

16

33.    "In terms of long and short term emotional damage it should be noted that once a person is a victim of negative communications of this type, because of human nature, their image and reputation will never be made whole again. Once "*seeds of doubt*" are planted that are negative, there will always be suspicion about the person by some. The old adages: "*You can't unring a bell*," "*Where there is smoke, there is fire*" and "*You can never wipe the slate clean*" ring true here. Therefore, nothing that can be done through litigation or any other means will completely erase the emotional pain and suffering now or in the future."

(See Declaration of Robert J. Fisher, ¶ 17)

34.    It is my opinion that Plaintiff will continue to suffer reputation damage far into the future. As an example, one only has to Google her name to see the pages of negative items about her. At the top of the first page is the NBC article and then five more pages of negativity. This will never go away. (See Declaration of Robert J. Fisher, ¶ 18)

35.    As aforementioned, after having reviewed a broad range of documentation and information related to this lawsuit brought by Plaintiff, it is my professional opinion that there is significant evidence to justify the causes of action of **Defamation and Defamation Per se** against NBC Universal, Brandy Zadrozny and Aliza Nadi in the United States District Court – Minnesota. It is my belief that there is ample evidence of malice, negligence and reckless disregard for the truth which resulted in the false statements, misrepresentations, actions and inactions of the Defendants in the preparation, writing and publishing of the article as outlined in this affidavit. (See Declaration of Robert J. Fisher, ¶ 20)

36.    In this case, Plaintiff seeks presumed damages, actual damages and punitive damages as a result of Defendants' defamation.

## PARTIES

37.     Plaintiff, Catelin Clobes, is a citizen of the State of Minnesota. Plaintiff suffered substantial harm to her reputation in Minnesota and throughout the world as a result of Defendants' defamation. *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 776-777 (1984) ("[f]alse statements of fact harm both the subject of the falsehood and the readers of the statement ... The tort of libel is generally held to occur wherever the offending material is circulated. Restatement (Second) of Torts § 577A, Comment a (1977). The reputation of the libel victim may suffer harm even in a state in which he has hitherto been anonymous. The communication of the libel may create a negative reputation among the residents of a jurisdiction where the plaintiff's previous reputation was, however small, at least unblemished.").

38.     Defendant, NBCUniversal Media, LLC, is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business in New York.

39.     The sole member of NBCUniversal Media, LLC is NBCUniversal, LLC, a limited liability company organized under the laws of the State of Delaware.

40.     The members of NBCUniversal, LLC are (i) Comcast Navy Acquisition, LLC, a limited liability company organized under the laws of the state of Delaware; (ii) Comcast Navy Contribution, LLC, a limited liability company organized under the laws of the state of Delaware; (iii) NBCUniversal Enterprise, Inc., which is incorporated in Delaware and has its principal place of business in Philadelphia, Pennsylvania; (iv) Comcast DW Holding, Inc., which is incorporated in Delaware and has its principal place of business in Philadelphia, Pennsylvania;  (v) Comcast CCW Holdings, LLC, a limited liability company organized under the  laws of the state of Delaware; (vi) Comcast Snap Holdings II, LLC, a limited liability com-

pany organized under the laws of the state of Delaware; and (vii) SNL Entertainment Holdings, Inc., a Delaware corporation with its principal place of business in Philadelphia, Pennsylvania.

41.     Comcast Corporation is the operating entity for NBCUniversal Enterprise, Inc., and Comcast Corporation is incorporated in the state of Pennsylvania and all of its operational, executive, administrative, and policy making functions, high level officers, and day-to-day operations are conducted at Comcast Corporation's corporate headquarters in Philadelphia, Pennsylvania.

42.     Comcast Corporation is the operating entity for (i) SNL Entertainment Holdings, Inc. and (ii) Comcast DW Holding, Inc., and all of their operational, executive, administrative, and policy-making functions, high level officers, and day to-day operations are conducted at Comcast Corporation's corporate headquarters in Philadelphia, Pennsylvania.

43.     The members of Comcast CCW Holdings, LLC and Comcast Snap Holdings II, LLC are (i) Comcast Navy Acquisition, LLC, and (ii) Comcast Snap Holdings, Inc., a Delaware corporation with its principal place of business in Philadelphia, Pennsylvania. Comcast Corporation is the operating entity for Comcast Snap Holdings, Inc., and all of its operational, executive, administrative, and policy-making functions, high level officers, and day-to-day operations are conducted at its corporate headquarters in Philadelphia, Pennsylvania.

44.     The sole member of Comcast Navy Acquisition, LLC is Comcast Corporation.

45.     The members of Comcast Navy Contribution, LLC are (i) Comcast SportsNet New England Holdings, LLC, a limited liability company organized under the laws of the state of Delaware; (ii) Comcast SportsNet Philadelphia Holdings, LLC, a limited liability company organized under the laws of the state of Delaware; (iii) Versus Holdings, LLC, a limited liability company organized under the laws of the state of Delaware; (iv) Comcast CHC, LLC, a limited

liability company organized under the laws of the state of Delaware; (v) Comcast Contribution

Holdings, LLC, a limited liability company organized under the laws of the state of Delaware;

and (vi) E! Holdings, Inc., a Delaware corporation, with its principal place of business in

Philadelphia, Pennsylvania.

46.    Comcast Corporation is the operating entity for E! Holdings, Inc., and all of its

operational, executive, administrative, and policy-making functions, high level officers, and day-

to-day operations are conducted at its corporate headquarters in Philadelphia, Pennsylvania.

47.    The members of Comcast SportsNet New England Holdings, LLC are  (i) Com-

cast SportsNet NE Holdings, Inc., a Delaware corporation with its principal place of business in

Philadelphia, Pennsylvania; and (ii) CSNNE Partner, LLC, a limited liability company organized

under the laws of the state of Delaware.

48.    Comcast Corporation is the operating entity for Comcast SportsNet NE Holdings,

Inc., and all of its operational, executive, administrative and policy making functions, high level

officers, and day-to-day operations are conducted at its corporate headquarters in Philadelphia,

Pennsylvania.

49.    The members of Comcast SportsNet Philadelphia Holdings, LLC are (i) Comcast

Holdings Corporation, a Pennsylvania corporation with its principal place of business in Penn-

sylvania; and (ii) Comcast Spectacor Holding Company, LLC, a limited liability company orga-

nized under the laws of the state of Delaware.  The sole member of Comcast Spectacor Holding

Company, LLC is Comcast Holdings Corporation.

50.    Comcast Corporation is the operating entity for Comcast Holdings Corporation,

and all of its operational, executive, administrative, and policy-making functions, high level offi-

cers, and day-to-day operations are conducted at its corporate headquarters in Philadelphia,

Pennsylvania. The members of Versus Holdings, LLC  are (i) Comcast Holdings Corporation; and (ii) E! Holdings, Inc.

51.     The sole member of Comcast CHC, LLC is Comcast Holdings Corporation.

52.     The sole member of Comcast Contribution Holdings, LLC is Comcast Corporation.

53.     The sole member of CSNNE Partner, LLC is Comcast Holdings Corporation..

54.     Accordingly, for purposes of determining diversity, Defendant, whose members are organized under the laws of Delaware or Pennsylvania, is regarded as a citizen of Delaware and Pennsylvania.

55.     Therefore, Plaintiff and Defendant are citizens of different States.

56.     Reaching more than 150 million households worldwide, including millions in Minnesota, NBC offers a full schedule of live news coverage, progressive voices, documentary programming – 24 hours a day, 7 days a week. NBC delivers breaking news and information across a variety of platforms, including www.nbcnews.com. NBC also promotes its business and causes via Twitter.

57.     Defendant Brandy Zadrozny is a senior reporter for NBC News.

58.     Defendant Aliza Nadi is a producer at NBC News.

59.     Defendants have one of the largest online subscribers in the country.

60.     Defendants transact business in the State of Minnesota including through the sale of online subscriptions in Minnesota and committed the tortious acts identified herein in the State of Minnesota.

61.     The Defendants published the online articles identified herein in the State of Minnesota.

62.     The Defendants have intentionally sought and obtained benefits from their tortious acts in the State of Minnesota.

63.     Plaintiff suffered substantial reputational and emotional harm in this District.

64.     There is a reasonable and direct nexus between the Defendants' tortious conduct in Minnesota and the harm suffered by Plaintiff in Minnesota and beyond.

65.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because the Defendants are subject to personal jurisdiction in this District and/or a substantial part of the events giving rise to this claim occurred in this District, including publication and injury.

### III. JURISDICTION AND VENUE

66.     The United States District Court for the District of Minnesota has subject matter jurisdiction over this action pursuant to Title 28 U.S.C. § 1332 (Diversity). The parties are citizens of different States. The amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

67.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because the Defendants are subject to personal jurisdiction in this District and/or a substantial part of the events giving rise to this claim occurred in this District, including publication and injury.

68.     Venue is proper in this Court pursuant to Title 18 U.S.C. §§ 1391(b)(2) and (b)(3).

### IV. ADDITIONAL FACTS

69.     Plaintiff is not an "all-purpose public figure", as she does not occupy any position of persuasive power or influence, whatsoever. Not when the article was printed, and not now. She

is not a famous movie star, an elite professional athlete, or the head of a major corporation. These kind of individuals don't ever lose their public figure status because their original source of fame is of continued interest to the public.

70.     Plaintiff is neither a "limited-purpose public figure", as she never thrust herself to the forefront of any public controversy to influence any sort of resolution involved. She initially shared her story via a Facebook post on March 2nd, 2019, the day after her daughter's death, simply asking for advice and similar stories. This one Facebook post included a video of her daughter giggling.

71.     Plaintiff hadn't been a regular on social media and only posted a handful of times in the year leading up to this post. She had no following. This post received just over 12,000 reactions out of an estimated 2.85 billion people who are on Facebook. My client does not control any social media algorithm on how many people see her posts.

72.     When Defendant Zadrozny attempted to interview the Plaintiff on national television, Plaintiff texted the following to Defendant Zadrozny, "*I'm just not made for television. If you take a close look at my posts, I make my voice for Evee. It's Evee and God giving me strength to tell her story. There is nothing prominent about me. Evee is the prominent one*." In other texts, Plaintiff writes the following, "*Why me? I'm nobody special. Just a grieving mom, don't want to be in that kind of spotlight*." (Copy of texts attached as Exhibit A.)

73.     This post is the largest presence she had on social media leading up to the NBC article. The controversy was not the public's, it was her own tragedy. It was her personal story that she has shared for a personal objective, not a public one. The posts were primarily updates about her search for answers to her daughter's death, what she specifically experienced through-

out that time, posts about her grief, and pictures & videos sharing and remembering her late daughter, Evee. She was not talked about or mentioned once in any mainstream media outlet prior to the NBC article.

74.     Plaintiff was certainly not a limited-purpose public figure before September 24th, 2019, and if you could even consider her a limited-purpose public figure now, it's because Defendants' article pushed her into that public spotlight. It was not Plaintiffs' own doing, and it has not been a positive spotlight in any way. In fact, not a single mainstream media source has done a positive or neutral story about Plaintiff, her daughter, or their story since the NBC article came out.

75.     Plaintiff declined to go on national television for an interview, clearly stating that she is "not a celebrity" and she didn't want that kind of attention. For comparison, courts have found the following individuals to be limited-purpose public figures:

- A retired general who advocated on national security issues. See Secord v. Cockburn, 747 F.Supp. 779 (1990).
- A scientist who was prominent and outspoken in his opposition to nuclear tests. See Pauling v. Globe-Democrat Publishing Co., 362 F.2d 188 (1966).
- A nationally-known college football coach accused of fixing a football game. See Curtis Publishing Co. v. Butts, 388 U.S. 130 (1967).
- A Playboy Playmate for purpose of a parody. See Vitale v. National Lampoon, Inc., 449 F. Supp 442 (1978).

Courts have found the following NOT to be limited-purpose public figures:

- A well-known lawyer and civic leader engaged in a very public trial involving police brutality. See Gertz v. Robert Welch Inc., 418 U.S. 323 (1972).
- A socialite going through a divorce who both collected press clippings on herself and held press conferences regarding the divorce. See Time, Inc. v. Firestone, 424 U.S. 448 (U.S. 1976).
- A Penthouse Pet for purposes of parody. See Pring v. Penthouse Int'l Ltd., 695 F.2d 438 (1982).

24

76.     Plaintiff's public status doesn't compare to any of the aforementioned individuals. Nobody has even talked about this specific lawsuit in the media even though Plaintiff has made it public knowledge for fundraising purposes. Plaintiff has a small group of followers and many who follow her are people who have been, and continue to stalk, smear, harass, and hurt her. If you look up her name on the internet you will find Defendants' defamatory article show up first, and then other media companies and blogs who replicated Defendants' article or who have written abusive pieces about my client AFTER Defendants' article came out.

77.     If you google Plaintiff or her late daughter's name up on social media, you will find fake social media pages, groups, and profiles who deceive the public by using the same name of Plaintiff's small, unofficial organization that she created in her late daughter's name, "Justice for Evee". You will see hundreds of posts and thousands of comments that publicly gaslight and manipulate the public by dismissing and shaming Plaintiff's every word while creating bold-faced lies about her personal life, her every action, her late daughter, people she interacts with, and much more as well as, harassing, belittling, embarrassing, and threatening Plaintiff.

78.     The word "defamation" does not properly represent the horrifying magnitude of what people have said and done about her, and to her, since Defendants' falsehoods went to print. Plaintiff has significantly backed off of social media because of this, unable to connect with people who have supported her, and other friends and family. However, these pages and groups haven't gone anywhere. They will never go anywhere, and her name will forever be falsely depicted and smeared on the internet as long as this vile, erroneous article remains. None of this was voluntary by Plaintiff. Nobody would volunteer for what Plaintiff has been and continues to

go through. There is no argument that the small public interest that exists right now is due to Defendants' initiation of such.

79.     Defendants' Statements  are materially false and expose Plaintiff to public ridicule, scorn, contempt, censure and prejudice Plaintiff now and forever in every walk of life.

**<u>Plaintiff's Damages</u>**

80.     On the early morning of September 24, 2019, the subject article was published and my phone exploded with phone calls, texts, and messages on all my social media platforms. There were horrible comments from random people all over my posts. They were talking about the article and my daughter's death in my hometown's Facebook group that family, friends, old colleagues, and my son's father, his wife, and "unfiltered" sister are in. They were talking about it, it seemed, everywhere. (Plaintiff's Declaration, ¶ 1).

81.     "That morning is when my awful, constant panic attacks started. My mind was consumed with the thousands of people, local, in the next state, across the country, in other countries, all talking about how big of a liar I was and that Evee really "suffocated", that this was a huge "scam", there was never a neuropathologist, they called me "Catie Anthony", I was "drunk and rolled over my baby", I "killed Evee", I was a "baby killer", I was "profiting" off the death of my daughter that I had actually caused. These are the nicer comments I read. I was in disbelief that the article didn't contain any of the current events, my current fight, nothing about "my side" of things. I don't even see it as two sides because the story NBC & Zadrozny deceitfully twisted and published is not even one of the two sides of the story. It's made up, a complete fabrication." (Plaintiff's Declaration, ¶ 2).

82.     I believe November 2019 is when I went in and started doing ketamine infusions for severe depression, grief, anxiety, and suicidal thoughts. I did the 6 infusions and then very sparingly but my parents couldn't afford to keep doing them for me. At this point, my suicidal thoughts, depression, anxiety, it was all treatment resistant. The first 6 infusions were $500 an infusion and all maintenance infusions were $400. Insurance doesn't cover a dime. This was the only treatment that helped my suicidal ideation and PTSD.  (Plaintiff's Declaration, ¶ 7).

### Count 1- Emotional Distress

83.     Plaintiffs repeat and re-allege each of the allegations set forth above as if fully set forth herein.

84.     Defendants engaged in extreme and outrageous conduct.

85.     Defendants conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized society.

86.     Defendants engaged in the aforementioned conduct with the intent to cause severe emotional distress to Plaintiffs.

87.     Defendants engaged in the aforementioned conduct in disregard of a substantial probability of causing severe emotional distress to Plaintiff and her child.

88.     Plaintiffs have suffered emotional distress.


### Count 2- Reasonable Care

89.     Plaintiffs repeats and re-alleges each of the allegations set forth above as if fully set forth herein.

90.     Defendants owed a duty to Plaintiff of reasonable care under the circumstances.

91.     Defendants breached that duty.

92.     As a result of Defendants failure to exercise reasonable care under the circumstances, Plaintiff has suffered damages.

**Count 3- Defamation**

93.     Plaintiff repeats and re-alleges each of the allegations set forth above as if fully set forth herein.

94.     Plaintiff has been a private figure for the purposes of this defamation action, living her entire life outside of the public eye.

95.     Prior to September 24, 2019, Plaintiff had no notoriety of any kind in the community at large.

96.     Plaintiff did not engage the public's attention to resolve any public issue.

97.     Plaintiff did not make any public appearances prior to the false accusations against her.

98.     Plaintiff never asserted herself into the forefront of any public issues.

99.     Plaintiff's limited public statements after the accusations against her were reasonable, proportionate and in direct response to the false allegations against her and do not render her a limited public figure.

100.    Defendants published false and defamatory accusations negligently and with actual knowledge of falsity or a reckless disregard for the truth.

101.    As one of the world's leading media outlets, Defendants knew but ignored the importance of verifying damaging and, in this case, incendiary accusations against Plaintiff who lost her baby.

102.    Instead, Defendants recklessly rushed to publish their false and defamatory statements in order to advance their own political anti-religion agenda.

103.    In doing so, Defendants placed the defamation on main stream media, giving its false and defamatory accusations credibility and permanence.

104.    Defendants negligently published its false and defamatory accusations by departing from the reasonable standard of care employed by its journalists, including those standards articulated by the Society of Professional Journalists Code of Ethics.

105.    Defendants negligently and recklessly published its false and defamatory statements by failing to conduct a reasonable investigation prior to the publication.

106.    Defendants duty to investigate is heightened here because the incident was not breaking news and involved the death of an infant.

107.    Defendants negligently and recklessly failed to consult publicly available information demonstrating its false and defamatory statements to be false.

108.    Defendants negligently and recklessly published its false and defamatory statements in derogation of principles of journalistic ethics, including by failing to examine the way in which its own biases and agenda shaped its false reporting.

109.    Defendants actual malice is evidenced by its failure to retract its false and defamatory statements.

110.    Defendants published its false and defamatory statements with common law malice, including because it intended to Plaintiff and consciously ignoring the threats of harm that it knew would inevitably ensue, in favor of its political agenda.

111.    The publication of false and defamatory statements directly and proximately caused substantial and permanent damage to Plaintiff.

112.    The publication of false and defamatory statements were re-published by third parties and members of the mainstream and social media mob, which was reasonably foreseeable.

113.    The false and defamatory statements are defamatory per se, as they are libelous on their face without resort to additional facts, and as clearly demonstrated here, Plaintiff was subjected to public hatred, contempt, scorn, obloquy and shame.

114.    As a direct and proximate result of the false and defamatory statements and publication, Plaintiff suffered permanent harm to his reputation.

115.    As a direct and proximate result of the false and defamatory statements and publication, Plaintiff suffered severe emotional distress and mental distress.

116.    Defendants published its false and defamatory statements with actual malice and common law malice, thereby entitling Plaintiff to an award of punitive damages.

117.    Defendants conduct was so outrageous and willful, demonstrating that entire want of care that raises a conscious indifference to consequences.

118.    Plaintiff is entitled to an award of punitive damages to punish Defendants and to deter them from repeating such egregiously unlawful misconduct in the future.

WHEREFORE, Plaintiff respectfully prays:

a.   On the First Count, damages in an amount to be determined at trial;

b.   On the Second Count, damages in an amount to be determined at trial;

c.   On the Third Count, a judgment be entered against Defendants for substantial compensatory damages in an amount not less than Ten Million Dollars ($10,000,000.00);

d.   That judgment be entered against Defendants for punitive damages in an amount not less than Two Hundred Million Dollars ($200,000,000.00); and

e.   For such further relief that this Honorable Court deems just and proper.


## **DEMAND FOR JURY TRIAL**


Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial as to all issues triable by a jury.



Dated: Syosset, New York
          April 6, 2022


/s/ *Marjorie J. Holsten*
_____

Marjorie J. Holsten
Bar # 0185899
Attorney at Law
8525 Edinbrook Crossing
Suite 210
Brooklyn Park, MN 55443
(763) 420-7034

/s/ *James Mermigis*

_____

By:  James G. Mermigis, Esq.
The Mermigis Law Group, P.C.
*Attorneys for Plaintiff*
85 Cold Spring Road, Suite 200
Syosset, New York 11791
(516) 353-0075
(*Pro Hac Vice to be filed*)